UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

THOMAS P. MILTON,

02 Civ. _____

Plaintiff,

COMPLAINT

- against - .

ROSICKI, ROSICKI & ASSOCIATES, P.C.,
NCB SAVINGS BANK, FSB,
GREENSTEIN STARR GERSTEIN & RINALDI, LLP,
and ANDREA L. ROSCHELLE,

**TRIAL BY JURY
DEMANDED**

Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Plaintiff, Thomas P. Milton, acting as his own attorney pro se, alleges:

## THE PARTIES

1.      Plaintiff, a natural person, is a resident of the County, City and State of New

York.

2.      Upon information and belief, Defendant ROSICKI, ROSICKI & ASSOCIATES,

P.C. ("ROSICKI"), is a New York corporation located at One Old Country Road in Carle Place,

New York, that is engaged in the practice of law as a "debt collector" as defined in the Fair Debt

Collection Practices Act , 15 U.S.C. §1692 et seq. (the "FDCPA"), and holds itself out as having

expertise in collecting debts owed on loans made to finance the purchase cooperative apartments.

3.      Upon information and belief, Defendant NCB SAVINGS BANK, FSB ("NCB"), is

a federally chartered bank with its principal place of business in Hillsboro, Ohio, and an office at

250 Park Avenue in New York, New York, that does business in New York by making loans to

cooperative housing corporations and to individuals to purchase cooperative apartments.

4.      Upon information and belief, Defendant GREENSTEIN STARR GERSTEIN &

RINANLDI, LLP ("GREENSTEIN STARR"), is a New York partnership located at 57 West 38th Street in New York, New York, that is engaged in the practice of law as a "debt collector" as defined in the FDCPA, and holds itself out as having expertise in collecting debts owed to cooperative housing corporations in New York.

5.      Upon information and belief, Defendant ANDREA L. ROSCHELLE, a natural person, is an attorney and partner in Defendant GREENSTEIN STARR in New York, New York, and is individually a "debt collector" as defined the FDCPA.

6.      Upon information and belief, the Defendants ROSICKI, NCB, GREENSTEIN STARR and ROSCHELLE have each conspired between and among themselves by acting in concert, collusion and complicity with one another, and have aided and abetted the actions and omissions asserted to be violations of law and/or the basis of Plaintiff's claims for relief herein.

JURISDICTION AND VENUE

7.      This Court has subject matter jurisdiction over the matters involved in this action pursuant to 28 U.S.C. § 1331 in that this action arises under the laws of the United States; and also pursuant to 28 U.S.C. § 1367 in that all of Plaintiff's claims in this action are so related that they form part of the same case or controversy under Article III of the United States Constitution.

8.      This district is the proper venue under 28 U.S.C. § 1391(b) in that: (A) Defendant ROSICKI, and Defendant NCB reside in the boroughs of Brooklyn and/or Queens within this district within the meaning of 28 U.S.C. § 1391(c)[1] ; and/or (b) a substantial part of the events or

---

[1]      Under 28 U.S.C. § 1391(c), for purposes of venue "a defendant that is a corporation shall be deemed subject to personal jurisdiction at the time the action is commenced" and "in a State which has more than one judicial district and in which a defendant that is a corporation is subject to personal jurisdiction at the time an action is commenced, such

omissions giving rise to the claims asserted by Plaintiff in this action occurred in this district.

### FACTS PERTAINING TO  PLAINTIFF'S CLAIMS FOR RELIEF HEREIN

Background: The Initial and Current Amount of Defendant NCB's Loan and
Defendant NCB's *Own* Initial and Current Valuations of Its Collateral

9.      On August 12, 1994, Defendant NCB loaned $68,000 (the "Loan Amount") to

finance Plaintiff's purchase of 420 shares (the "Shares") in 305/72 Owners Corp. ("the

Cooperative Corporation" or the "Cooperative") and the appurtenant proprietary lease (the

"Proprietary Lease") for a two-bedroom apartment at 305 East 72nd Street in New York, New

York, known as 1A-North ("Plaintiff's Apartment"), with Defendant NCB taking possession of

the Shares and Proprietary Lease for Plaintiff's Apartment as collateral for its loan (the

"Collateral").

10.  .  At the time that Defendant NCB provided the Loan Amount, Defendant NCB

appraised the Collateral at $125,000.  (That appraisal is annexed as Exhibit A).

11.      The Loan Amount has since been reduced to under $63,000, while the Collateral

was recently valued by Defendant NCB's own real estate experts as comparable to apartments in

like buildings on the same block that have sold for more than $750,000.00 (A recent statement of

the Loan Amount and two valuations of NCB's experts are annexed as Exhibit B and Exhibit C).

_____

corporation shall be deemed to reside in any district in that State with which its contacts would
be sufficient to subject it to personal jurisdiction if that district were a separate State."

The Impairment of the Collateral Since Early 1999; the Complicity of Defendants
ROSICKI, NCB, GREENSTEIN STARR, and ROSCHELLE in That Impairment;
and Plaintiff's Forced Evacuation Because of That Impairment at the End of 2001

12.    Since early 1999 and continuing to date, the Collateral has been substantially

impaired by conditions rendering Plaintiff's Apartment so unfit for habitation that Plaintiff was

forced to commence legal action at the end of 1999 in state court against the Cooperative seeking

damages and injunctive relief to remedy the impairment of the state Collateral.  (A copy of the

Summons with Notice filed December 31, 1999 (the "Summons"), commencing action against

the Cooperative is annexed as Exhibit D).[2]

13.    Plaintiff purposely withheld service of the Summons until the end of the 120-day

period provided by New York law in the hope that the Cooperative would resolve this matter

without the need for Plaintiff to pursue that litigation.  When neither the Cooperative nor its

attorneys, defendant GREENSTEIN STARR, contacted Plaintiff to resolve this matter, Plaintiff

served the Summons with Notice at the end of April 2000.[3]

14.    Even though Plaintiff's Apartment became unfit for habitation beginning in early

1999, Plaintiff continued to pay the full amount of maintenance charges *and* a special assessment

---

[2]    The "305/72 Owner's Corp Action", commenced on December 30, 1999, in the
Supreme Court for the State and County of New York is captioned "Thomas P. Milton v. 305/72
Owners Corp.," bears Docket Number "99/125891" and is assigned to the Hon. Walter B. Tolub.

[3]    Plaintiff had requested his process server to serve the Managing Agent for the
Cooperative Corporation to avoid any perceived humiliation that might otherwise be felt by an
officer or director of the Cooperative Corporation served with process.  The Managing Agent,
however, refused to make anyone available to accept service -- apparently on the advice of the
Cooperative Corporation and/or its attorneys, the Defendant Greenstein Starr and the Defendant
Roschelle.  As a result, Plaintiff incurred the additional expense involved in effecting service on
the Cooperative Corporation through service on the Secretary of State in Albany, New York.

4

for 20 months through September 2000, and it was only in October 2000 that Plaintiff began

withholding his monthly payments -- as permitted under New York law to force a recalcitrant

lessor to comply with its obligations to provide habitable premises under Real Property Law

§235-b.  (A copy of RPL §235-b is annexed as Exhibit E).

15.   Plaintiff undertook such action in October 2000 only after receiving a bill in the

amount of $501.40 for the purported legal services that Defendant GREENSTEIN STARR and

Defendant ROSCHELLE provided to the Cooperative in connection with the ½-page Summons

that Plaintiff had served in April 2000.  (The statement of GREENSTEIN STARR seeking

payment by Plaintiff of $501.40 for Defendant GREENSTEIN STARR and Defendant

ROSCHELLE'S services for the Cooperative in reviewing Plaintiff's ½ page Summons is

annexed as Exhibit F ).

16.   As this billing of Plaintiff for the Cooperative's expenses made clear that Plaintiff

would be required to pursue litigation to obtain habitable premises,  Plaintiff served his Verified

Complaint later that same month.  (The Verified Complaint, dated October 30, 2000, is annexed

as Exhibit G).    The Cooperative provided a boiler-plate Verified Answer (without the required

verification) consisting of only blanket general denials.  Following the Cooperative's discovery

requests in November 2000, Plaintiff promptly served his responses and also served his own

discovery requests in early December 2000.   The Cooperative, however, has since refused to

provide responses Plaintiff's to Plaintiff's discovery requests, requiring Plaintiff to make a

motion in mid-December 2001 to compel responses to discovery requests that had been served

more than a year earlier in December 2000.   As that motion still remains <u>sub judice</u> date five

months later,  the Cooperative has effectively prevented Plaintiff from raising in his state court

5

action the many deplorable conditions that render Plaintiff's Apartment uninhabitable and that thus seriously impair the Collateral.

17.     Meanwhile, due to the impact of such conditions on Plaintiff's deteriorating health, in late December 2001 -- after almost 3 years of trying to survive under brutally inhuman conditions on a daily basis -- Plaintiff was forced to evacuate Plaintiff's Apartment for a small studio several miles away and so advised the Cooperative and the Defendants in this action by letters dated December 31, 2001 (via a copy sent to GREENSTEIN STARR and ROSCHELLE) and January 14, 2002 (to ROSICKI and its client NCB).  (The December 31, 2001 and January 14, 2002 letters are annexed as Exhibits H and I, respectively).

### The Actions of Defendant GREENSTEIN STARR, Defendant ROSCHELLE and Defendant NCB in Attempting to Collect a Debt and in Actually Obtaining Collection of That Debt in Violation of the Fair Debt Collection Practices Act

18.     Even though Defendant GREENSTEIN STARR and Defendant ROSCHELLE both knew that Plaintiff had begun withholding payment of his monthly charges in October 2000 only after having paid full charges for 20 months and even though Defendant GREENSTEIN STARR and the Defendant ROSCHELLE both knew that no action had been taken to restore Plaintiff's Apartment to a condition of habitability, Defendant GREENSTEIN STARR and Defendant ROSCHELLE sent to Plaintiff on or about May 17, 2001, a Notice of Default and Intention to Terminate Proprietary Lease (the "May 17, 2001 Notice) seeking amounts that Plaintiff had withheld pursuant to his rights to do so under New York law.  (The May 17, 2001 Notice is annexed as Exhibit J).

19.     The May 17, 2001 Notice bears the initials ALR (those of Defendant

6

ROSCHELLE) in the lower left-hand corner and reflects the imposition of a $500 charge for the legal fees of GREENSTEIN STARR and ROSCHELLE in connection with this is standard one-page form.

In addition, the May 17, 2001 Notice was delivered in an envelope that bore the pre-printed return address of Defendant GREENSTEIN STARR.

20.    Upon information and belief, as reflected in the May 17, 2001 Notice itself, a copy was sent by the Defendant GREENSTEIN STARR and the Defendant ROSCHELLE to the Defendant NCB at both its main office in Hillsboro, Ohio, and its local office in New York, NY.

21.    However, on May 10, 2001 -- a week <u>before</u> the May 17, 2001 Notice -- Plaintiff sent a 6-page letter with a 3-page summary of enclosures (consisting of court papers in the <u>305/72 Owners Corp. Action</u>) to Defendant NCB at its main office in Hillsboro, Ohio, by Federal Express overnight delivery.  (Plaintiff's May 10, 2001 6-page letter and 3-page summary of enclosures [without those enclosures here] that were sent to Defendant NCB are annexed as Exhibit K).

22.    By this May 10, 2001 letter, Defendant NCB was expressly put on notice that Plaintiff had expended hundreds of hours (worth hundreds of thousands of dollars of his own legal time) on behalf of Defendant NCB, as well as himself, in an effort to restore the severely-impaired Collateral and had endured deplorable living conditions for approximately 28 months without success.   Indeed, in that letter Plaintiff enlisted the support of Defendant NCB in using its efforts to restore the severely-impaired Collateral.

23.    In that same May 10, 2001 letter, Plaintiff also asked Defendant NCB to send to him a copy of the original Proprietary Lease that NCB had taken into its possession at the

Closing on August 12, 1994, because Plaintiff had been provided a copy of only the cover page and the signature pages at the end of the Proprietary Lease. As Plaintiff advised NCB, he had been seeking a copy of that Proprietary Lease without success for a year-and-a-half from the Cooperative and its counsel GREENSTEIN STARR.

24.     Even though the May 17, 2001 Notice from GREENSTEIN STARR and ROSCHELLE referenced alleged violations of specific provisions of the Proprietary Lease and even though GREENSTEIN STARR and ROSCHELLE had received numerous requests in writing from Plaintiff for a copy of his Proprietary Lease over a 16-month period dating back to December 1999, Defendant GREENSTEIN STARR and Defendant ROSCHELLE had refused to provide Plaintiff a copy of the Proprietary Lease.

25.     Plaintiff received no response from Defendant NCB to the May 10, 2001 letter and its enclosures that were delivered to Defendant NCB by Federal Express on May 11, 2001. Defendant NCB neither called or wrote to Plaintiff at that time (or at any other time) to respond e to his entreaties for its assistance in restoring the severely-impaired Collateral. Nor did Defendant NCB communicate with Plaintiff following its receipt of a copy of the May 17, 2001 Notice from GREENSTEIN STARR and ROSCHELLE.   And, even though Plaintiff had asked NCB to "send [him] a copy of [his] Proprietary Lease *as soon as possible*!", NCB made no immediate response to this request. (Italics in original).

26.     Receiving no response, Plaintiff again wrote to Defendant NCB by letter dated June 5, 2001, again entreating Defendant NCB to take action with respect to the severely impaired Collateral and again requesting a copy of his Proprietary Lease noting that, although "the Cooperative's lawyers *know that I do not have a copy of my Proprietary Lease* and further

8

*know that I have been asking for a copy for a year-and-a-half,* no copy of my Proprietary Lease was furnished to me with [the May 17] Notice (italics in original)."   (This June 5, 2001 letter is annexed as Exhibit L).  Finally, approximately 2 weeks later, in mid-June 2001, a copy of this Proprietary Lease arrived by mail in a plain-brown envelope bearing the Ohio return address of NCB; there was no cover letter and no other communication from Defendant NCB.

27.    On July 18, 2002, Plaintiff again wrote to NCB's Hillsboro, Ohio headquarters, once again entreating Defendant NCB to take action with respect to the severely-impaired Collateral.  (This July 18, 2001 letter is annexed as Exhibit M).

28.    It was not until on or about July 24, 2001 that Plaintiff received a telephone call from Defendant NCB's Ohio headquarters advising Plaintiff that on May 24, 2001, i.e., *two*  *full* months earlier, Defendant NCB had made full payment of the disputed amount sought under the May 17, 2001 Notice, apparently including GREENSTEIN STARR and ROSCHELLE legal fee of $500, without even notifying or conferring with Plaintiff.

29.    Plaintiff was advised in that same telephone conversation that NCB had forwarded payment based on the threat made by a New York lawyer representing the Cooperative, whom the NCB representative stated was Defendant ROSCHELLE of Defendant GREENSTEIN STARR, that unless payment was made within 10 days of the May 17, 2001 Notice, Plaintiff's Proprietary Lease would be automatically termination by the Cooperative -- directly contrary to New York law that expressly prohibits automatic termination for such non-payment and instead requires a judicial proceeding in which the lessee can raised defenses and assert counterclaims.

30.    Indeed,  because New York law does not permit a Proprietary Lease to be

9

terminated automatically for non-payment of monthly charges but instead requires a court

determination where habitability defenses can be raised by an aggrieved lessee, and because the

Cooperative Corporation and its lawyers had demonstrated that they had no desire to obtain such

judicial adjudication by way of counterclaim in the <u>305/72 Owners Corp. Action</u> that Plaintiff

had commenced State Supreme Court in December 1999, Plaintiff had spent many hundreds of

hours during May, June and July 2001 on legal research concerning various substantive and

procedural aspects of New York's Real Property Law ("RPL") and Real Property Actions and

Proceedings Law ("RPAPL") in anticipation of and preparation for a non-payment proceeding

that would be brought by the Cooperative Corporation and its lawyers, the Defendant

GREENSTEIN STARR and Defendant ROSCHELLE, in the Landlord-Tenant Part of the Civil

Court of the City and County of New York.  All of this work would have been avoided if only

Defendant NCB or Defendant ROSCHELLE or Defendant GREENSTEIN STARR had the

decency and courtesy to notify Plaintiff that payment had, in fact, been made on or about May 24,

2001.

      31.     By letter to Defendant NCB dated July 31, 2001, Plaintiff protested this payment,

made without notice to Plaintiff and in the face of earlier written notice from Plaintiff that the

purported arrears were NOT legally due and owing, and insisted that Defendant NCB demand

return of the amount that it had voluntarily and improperly paid so that Plaintiff could force the

issue and obtain the restoration of the Collateral, <u>i.e.</u>, Plaintiff's Apartment, to a state of

habitability. (This July 31, 2001 letter is annexed as Exhibit N).  NCB provided no response.

      32.     A month later Plaintiff wrote to Defendant NCB by letter dated August 31, 2001,

advising of the still further impairment of the Collateral and once again entreating NCB to take

action to protect its impaired Collateral.  (This August 31, 2002 letter is attached as Exhibit O).

33.     Although Plaintiff had sent directly to Defendant NCB by certified mail or FedEx, 5 exhaustively-detailed letters (May 10, June 5, July 18, July 31 and August 31, 2001) and had included enclosures detailing the extent to which the Collateral had been substantially impaired -- to the point where Plaintiff's Apartment was almost completely uninhabitable and totally unmarketable and unsaleable, NCB provided no response.

34.     In addition, Plaintiff had sent to Defendant NCB as of August 31, 2001, by certified mail, copies of numerous letters that had been sent to the Board of Directors of the Cooperative, its managing agent, and its general counsel, the Defendant GREENSTEIN STARR and the Defendant ROSCHELLE, outlining in exhaustive and excruciating detail the many conditions that substantially impaired the Collateral.

35.     Defendant failed to respond to any of these letters and took no action whatsoever to seek restoration of the Collateral.  To the contrary, by improperly paying over to the Cooperative amounts sought as purported arrears for monthly charges for premises that were uninhabitable -- based on the unlawful and improper threat of Defendant ROSCHELLE and Defendant GREENSTEIN STARR that the Proprietary Lease would be automatically terminated extinguishing Defendant NCB's interest in clear violation of applicable New York law prohibiting such termination without a judicial determination -- Defendant NCB exacerbated the already substantial and severe impairment of the Collateral and, at the same time, callously consigned Plaintiff to still further months of abuse and mistreatment.[4]

_____

[4]     Just one example of that further abuse can be seen from the letter, dated August 20, 2001, that Plaintiff sent to the Cooperative, that details the capture of 11 mice in the 10-day period between August 10 and August 20 and also notes the capture of 31 mice in 34 days in the

Actions and Omissions of Defendant NCB and Defendant ROSICKI in
Improperly and Unlawfully Attempting to Sell Plaintiff's Apartment

36.     Instead of responding to the letters that Plaintiff was sending to Defendant NCB,

on October 4, 2001, following several more months during which NCB continued to do nothing -

- while Plaintiff, who had became increasingly ill from the conditions that gave rise to the severe

impairment of Plaintiff's Apartment, was left to fight on his own to restore the Collateral for the

benefit of both himself and NCB -- Plaintiff received a September 27, 2001 Notice from NCB's

debt collector, Defendant ROSICKI, advising of Defendant NCB's acceleration of the balance of

the Loan Amount and of Defendant ROSICKI's intention "to commence appropriate legal

proceedings" (which Plaintiff assumed to mean a court action) to attempt to collect Defendant

NCB's asserted debt of $63,786.19 (the "September 27, 2001 Notice of Acceleration").  (This

September 27, 2001 Notice of Acceleration is attached as Exhibit Q).

37.     On that same October 4, 2001 date that he had received the September 27, 2001

Notice of Acceleration, Plaintiff called Defendant ROSICKI to acknowledge its receipt and to

ascertain what steps that its client NCB had undertaken to restore the severely impaired

---

10-day "documentation periods" in mid-June, mid-July and mid-August 2002.  (This was
representative of the daily experience of Plaintiff in non-documentation periods when, instead of
taking the dead mice to show them to the doormen, Plaintiff simply flushed them down the
toilet). This letter further notes the "edict" that the Cooperative had issued -- "Do not sign for
Milton's mice" -- and that was posted at the front desk, instructing the doormen not to
acknowledge the capture of these mice by signing a piece of paper, stating the date and time of
the capture by Plaintiff of individual mice, that Plaintiff had routinely asked them to sign.
Emboldened by the ability to deter Plaintiff from getting habitability issues before a Court and
knowing that NCB would cooperate by making payment of amounts that Plaintiff was
withholding in an effort to get into court one way or the other, the Cooperative had nothing to
fear from continuing to ignore Plaintiff.  (This August 20, 2002, reflecting a certified mail copy
sent to NCB, is annexed as Exhibit P).

Collateral over the course of the last 5 months during which Plaintiff had directed more than 50

letters together with copies of the state court papers in the <u>305/72 Owners' Corp. Action</u>.

Plaintiff also advised Defendant ROSICKI that, as he had 30 days in which to assert rights

provided under the FDCPA, he was deferring temporarily his entitlement to pursue such rights to

allow time for Defendant ROSICKI to obtain from NCB the extensive correspondence Plaintiff

had directed to NCB and to contact Plaintiff after reviewing that correspondence.  This was

confirmed by a letter dated October 14, 2001 that Plaintiff sent to Defendant Rosicki.  (This

October 14, 2001 letter is attached as Exhibit R).[5]

---

[5]    Plaintiff ended that October 14, 2001 letter to Defendant ROSICKI stating:  "I
would appreciate it if your would give me a call as soon as you can after you have obtained and
reviewed all of my prior correspondence so that we can discuss a possible resolution of this
matter that is in the mutual best interests of your client and me" and providing his telephone
number for that purpose.  In a footnote, Plaintiff advised Defendant ROSICKI of the seriousness
of the situation stating: "The atrocious and deplorable conditions to which I have been subjected
for 34 months have worn down my health to the point where I may soon be forced to completely
evacuate my apartment.  (I am already constructively evicted from most of it.)  My doctor, my
family, my close friends, and my parish priest are all insistent that I get out from under the
brutally inhumane conditions to which I am daily subjected.  If forced to evacuate my apartment,
I will keep my phone machine active so that you can leave a message for me and I will return
your call."

        Plaintiff shortly thereafter obtained the permission of his parish priest to sleep at
his church's homeless shelter which would shortly be opening for the winter.  Plaintiff thereafter
declined to avail himself of this shelter out of concerns for the negative impact that such a move
would have, from a psychological standpoint, on his existing illness, fearing that it would only
make that illness even worse.  Also, a benefactor offered to let Plaintiff stay on a temporary basis
at the studio apartment where Plaintiff has been living since the end of December 2001.  As
reflected below, Plaintiff never received the call from Defendant ROSICKI that he had requested
in this October 14, 2001 letter.  From the only other telephone conversation that Plaintiff had
with Defendant ROSICKI on November 20, 2001, it appeared that Defendant ROSICKI never
obtained and reviewed any of the extensive correspondence Plaintiff had directed to its client
NCB.  See Paragraph ___ and Exhibit _, Plaintiff's letter of November 21, 2001 where, in a
footnote on page 2, Plaintiff wrote:

        "In our only other telephone conversation on October 4, 2001, I pointed out that

13

38.     When Plaintiff did not hear from Defendant Rosicki by November 4, 2001 -- the last day of the 30-day-period provided under the FDCPA for Plaintiff to officially challenge the amount and validity of the debt sought to be collected -- Plaintiff wrote a letter to Defendant ROSICKI, dated November 4, 2001, asserting a formal challenge to collection of the asserted debt on the various grounds set forth in that letter and at the same time preserving all rights otherwise available to Plaintiff, at law and in equity, including the "right to seek to have a court invalidate the status of NCB as a secured creditor on the grounds of waiver and failure to take action to protect its purported security interest." (This November 4, 2001 letter is annexed as Exhibit S).

39.     By letter dated November 19, 2001 and sent to Defendant ROSICKI by fax that same morning, Plaintiff asked for a response to his November 4, 2001 letter together with information concerning the steps that had or would be taken by Defendant ROSICKI and Defendant NCB to restore the impaired Collateral.  Plaintiff stressed the urgent need for such response and information in light of a new Notice of Default and Intention to Terminate Proprietary Lease dated November 5, 2001 (the November 5, 2001 Notice) that had been received by Plaintiff from Defendant GREENSTEIN STARR and Defendant ROSCHELLE -- with copies indicated as having been sent to NCB's Ohio and New York offices -- by which Defendant GREENSTEIN STARR and Defendant ROSCHELLE sought to collect additional monthly charges as to which Plaintiff had withheld payment -- as he was entitled to do under

---

there were numerous letters that I had written to the Board – with copies sent to NCB by certified mail – as well as letters sent directly to NCB, setting forth these conditions is extensive detail.  You appeared not to be familiar with any of them at that time.  (And you appeared not to be familiar with them in our conversation yesterday as well.)"

New York law to force his recalcitrant lessor, the Cooperative Corporation, to comply with its obligation under RPL §235-b to provide habitable premises -- with respect to those months following the previous improper payment of such amounts by Defendant NCB. (This November 19, 2001 letter is annexed as Exhibit V and the November 5, 2001 Notice is annexed Exhibit U).

40.    Plaintiff followed up this November 19, 2001 letter by calling the offices of Defendant ROSICKI in the late-afternoon that same date, leaving a voice message urgently requesting a return telephone call that same date. Plaintiff received no return call on that date.

41.    When Plaintiff had still not received a return call from Defendant ROSICKI by mid-afternoon of the next day, November 20, 2001, Plaintiff again called Defendant ROSICKI. The substance of that conversation Plaintiff is reflected in a letter dated the following date, November 21, 2001, that Plaintiff sent to Defendant ROSICKI confirming this November 20 telephone conversation. (The November 21, 2001 letter is annexed as Exhibit W).

42.    As indicated in that November 21, 2001 letter, Defendant ROSICKI has taken the bizarre position that the Collateral that it would be selling at auction is not Plaintiff's Apartment -- that is beset with a host of deplorable conditions that render it uninhabitable -- but only the Shares and Proprietary Lease. With the aid of this hair-splitting hyper-technical nicety, Defendant ROSICKI maintains that there is no requirement for any disclosure -- ignoring the fact that the Shares and Proprietary Lease are worthless pieces of paper without Plaintiff's Apartment itself and ignoring the law, including the anti-fraud provisions of New York State's securities laws that make it unlawful to fail to disclose material information in connection with the sale of such shares.

43.    As further indicated by that November 21, 2001 letter, Defendant ROSICKI

15

continues to maintain that Defendant ROSICKI and its client Defendant NCB were and are

entitled to advance on behalf of Plaintiff all purported "arrears" sought by the Cooperative

Corporation based on provisions of the loan agreement authorizing the <u>discretionary</u> payment of

monthly cooperative charges not paid by the borrower: (a) even where, as here, those charges are

disputed, (b) even where, as here, automatic termination of the proprietary lease is forbidden by

New York law, (c) even where, as here, the Cooperative would be required to obtain a judicial

determination as to such "arrears" prior to the termination of the proprietary lease, (d) even

where, as here, there is a statutory "cure" period following any adverse judicial determination in

which NCB (or Plaintiff or someone on his behalf) could make payment to avoid termination of

the proprietary lease, (e) even where, as here, NCB's payment of those purported "arrears"

deprived Plaintiff of his legal rights to obtain habitable premises and constituted a impermissible

waiver of the protections afforded by RPL §235-b, (f) even where, as here, payment by NCB of

those purported "arrears" in the face of express and extensive written notice of conditions

severely impairing the Collateral was and would be in breach of the covenant of good faith and

fair dealing implied under New York law into every contract including, in particular, the loan

agreement here between Plaintiff and NCB, and (g) even where, as here, such action by NCB in

paying purported "arrears" -- that it knew to be vigorously disputed by Plaintiff -- would cause

Plaintiff to be consigned to further additional months of being forced to live in uninhabitable

premises that had already caused him to be made seriously ill.

44.     As further reflected by that November 21, 2001 letter, it had been a bedeviling

puzzlement to Plaintiff why Defendant NCB had refused to take even the simplest of measures to

protect its interest in the severely-impaired Collateral despite repeated notices and entreaties that

16

NCB provide Plaintiff with some response and assistance.  Defendant ROSICKI provided no

answer to this perplexing riddle.[6]

45.    Plaintiff began and concluded that November 21, 2001 letter with the entreaty,

once again, that Defendant ROSICKI and Defendant NCB work with Plaintiff to restore the

Collateral to a condition that would enable Plaintiff to sell the Collateral instead of working

against Plaintiff, writing:

> "In conclusion, I repeat what I have stated previously.  You can hold off on
> pursuing me and join with me in pressuring the Cooperative to restore my apartment to
> habitability so that I can sell my apartment – which I have been desperate to do but cannot
> because of the deplorable conditions that render my apartment uninhabitable and
> unmarketable.  (Unlike you, I consider fraud something that I do not want to be accused
> of and would make full disclosure for both moral and legal reasons).  If you work with

---

[6]         Interestingly, Plaintiff wrote in that letter:

"To most objective, reasonable and fair-minded people, the bank's abdication of its
responsibility with respect to the impaired collateral/asset together with its full-speed-
ahead efforts to collect the debt from the debtor –  who has become ill and impoverished
in the process of fighting for both himself and the creditor-bank – would clearly constitute
a unfair debt collection practice.  <u>What they will, no doubt, find _extremely puzzling_ is why
the creditor-bank failed to take even the simplest of measures to protect its collateral from
impairment.</u>"

It was only last month Plaintiff was finally able to decipher the "extreme puzzlement"
expressed in this November 21, 2001 letter.   As noted below in Paragraph __, on or about April
1, 2002, Plaintiff was able to take a peek at a copy of the Cooperative's 2001 Financial
Statements that were left out at the concierge desk at the Cooperative.  (Individual copies labeled
with the name and apartment listing of other shareholders were stacked on the concierge desk for
the doormen to distribute. Not surprisingly, given the information contained in the Financial
Statement discussed below, no copy was provided for Plaintiff.)   <u>In the footnotes to the
Financial Statement was the answer to the "puzzle", explaining why NCB had not taken "even
the simplest of measures":</u> **It appears that NCB had, all along, been pursuing a more
lucrative deal for itself that culminated in a loan by NCB to the Cooperative on February 5,
2002 that will likely guarantee NCB more than a quarter million dollars a year for the next
20 years!!!**  (As of the date of this complaint, more than 7 weeks later, Plaintiff has not still not
been provided a copy of this Financial Statement -- which the Proprietary Lease requires to be
provided to every shareholder within 3 months of the end of the calendar year).

17

me, rather than against me – which is the "right thing to do" because I am the victim here – we can together force the Board of Directors to restore my apartment to habitability so that it can be sold and we can both get our money out of it.

"On the other hand, if you persist in your present efforts, I will fight for my rights with all of the strength and energy that I can muster considering my illness.  At the very least that will include a lawsuit against you in which I will challenge every penny that you claim to be due and seek compensatory and punitive damages, as well as the recovery of the value of my legal services on behalf of your client's interest in my apartment (since you have failed to do anything to protect your interest against impairment)."

Plaintiff received no response to this letter.  Rather than "holding off" on pursuing Plaintiff and "joining with [Plaintiff]" to restore the Collateral, Defendant ROSICKI's response on behalf of itself and its client NCB was (1) a letter dated November 14, 2002, that Plaintiff received on or about November 22, 2002, providing a copy of the original Note and Security Agreement as its only response to Plaintiff's FDCPA challenges, and (2) a new Notice of Sale dated November 29, 2002, received by Plaintiff on or about December 1, 2001, announcing the scheduled auction of the Collateral on December 21, 2001 (the Friday before Christmas) (the "November 29, 2002 Notice of Sale").  (The November 14, 2002 letter from Defendant ROSICKI is annexed as Exhibit T; the November 29, 2002 Notice of Sale is annexed as Exhibit X).

Defendant ROSICKI's Publication of a Notice Advertising the Sale of the Collateral
On November 29, 2001 When It Was Required by Law to Cease Collection
Following Its Receipt of Plaintiff's November 4, 2001 Letter

46.    As stated in the November 21, 2001 letter, upon information and belief, the Defendant ROSICKI had gone forward with efforts at collection by publication of an advertisement announcing the auction sale of Plaintiff's Apartment on November 29, 2002, without any notice to Plaintiff.

18

47.     Plaintiff's basis for this belief derives from the fact that on Monday, November

19, 2002, he was visited by a rather unsavory real estate "scavenger" -- who had the building

doorman ring for Plaintiff with the request that Plaintiff meet with him outside the building.  This

individual, who gave Plaintiff only a cell phone number and refused to provide his last name,

told Plaintiff that there had been an advertisement in the papers announcing the auction sale of

Plaintiff's Apartment on November 29, 2002 -- which was the first word that Plaintiff had of any

such advertisement or prospective auction date.

48.     Indeed, the November 21, 2002 letter indicates that Defendant Rosicki had, in

fact, gone forward with publication of such notice of an auction sale.[7]

49.     Because this publication was, upon information and belief, undertaken following

the receipt by Defendant ROSICKI of Plaintiff's formal challenge under the FDCPA

incorporated in his November 4, 2002 letter, this action was a clear violation of the FDCPA's

requirements that a debt collector cease all efforts at collection until the requested verification is

---

[7]     Referring to the substance of a telephone conversation with a lawyer at the offices
of Defendant ROSICKI on November 20, 2002, the November 21 letter states on page 4:

> "You responded by stating that you had, indeed, gone forward with such
> publication but you "ducked" my question as to both you you could do so as well
> as the scheduled date.  All that you said was that the date of sale was pushed back
> to December 13 or December 20 -- explaining that you did not have the file in
> front of you.

> "When I pressed you to tell me how you could do so before providing the
> response to my challenge that is required under the Fair Debt Collection Practices
> Act, you continued to avoid response to my question by stating that "it had been
> taken care of by being pushed back" to either December 13 or December 20."

Also, in footnote 4 no page 10 of the same letter, there is reference to the real
estate "scavenger" referred to above in the body of the Complaint.

provided to the borrower.

Plaintiff's Notices as to Defendant's Numerous Violations of Law
in Connection with the Proposed December 21 Auction Sale

50.    Following Plaintiff's Receipt of the November 29, 2002 Notice of Sale scheduling

the auction of Plaintiff's Apartment for December 21, 2002, Plaintiff sent numerous notices to

Defendant ROSICKI setting forth multiple violations of law by Defendant ROSICKI and its

client Defendant NCB and demanding that Defendant ROSICKI cancel the scheduled sale

because of those violation, as set forth in Plaintiff's letters dated December 7, 12, 17, 18, 19 and

20, 2001 (which are annexed as Exhibits Y, Z, AA, BB, CC, and DD, respectively.

51.    Defendant ROSICKI failed to respond to any of those letters and instead

continued with its plans for the December 21 auction sale, only determining to abort the

scheduled sale at approximately 9:00 p.m. on Thursday, December 20, 2001, only hours before

the scheduled sale at 9:00 a.m. the next morning, based on Plaintiff's representation, through his

bankruptcy counsel, that Plaintiff would file a petition in bankruptcy when the Court opened on

December 21, 2001, to obtain the benefits of the automatic stay and a court-approved sale of

Plaintiff's Apartment that would bring fair value to Plaintiff and not simply the amount (or a

lesser portion thereof) claimed to be owing to Defendant NCB, coupled with Plaintiff's statement

to Defendant ROSICKI that he would hold Defendant ROSICKI and Defendant NCB

accountable for additional compensatory and punitive damages if he was forced to take such

action.

52.    Typical of the violations of law by Defendant ROSICKI and the cavalier disregard

exhibited by Defendant ROSICKI as to its legal obligations, a letter dated December 19, 2001

20

and bearing a Carle Place postmark dated the same December 19 date -- little more than a day before the scheduled auction -- advising of the amount that Plaintiff could pay <u>prior to</u> the December 21 scheduled auction to redeem his far more substantial equity interest in the Collateral and thereby avert that auction sale arrived in Plaintiff's mail on Saturday, December 22, 2001, a day <u>after</u> the sale would otherwise have been concluded!  (A copy of this December 19, 2001 letter from Defendant ROSICKI and of the envelope bearing a December 19 postmark are annexed as Exhibits EE and FF).

The Complicity of Defendants ROSICKI, NCB,<br>
GREENSTEIN STARR, and ROSCHELLE in the Improper Payment<br>
<u>of Purported "Arrears" Following the November 5, 2001 Notice</u>

53.     As noted above by the November 5, 2001 Notice, Defendants GREENSTEIN STARR and ROSCHELLE sought to collect a debt asserted to be owed for additional purported "arrears" in this second such Notice, in a similar fashion to the earlier May 17, 2001 Notice -- which, like the earlier instance, represented amounts for monthly charges that Plaintiff had once again withheld following the earlier improper payment by NCB on May 24, 2001 based on the improper threat made by Defendant GREENSTEIN STARR and Defendant ROSCHELLE.

54.     Following Plaintiff's receipt of this November 25, 2001 Notice, Plaintiff had written to Defendant ROSICKI advising of the earlier improper payment (by Defendant NCB on May 24, 2001) in Plaintiff's November 21, 2001 letter (Exh. W) so that a similar improper payment would not be made pursuant to this second such notice -- which would only thwart Plaintiff's efforts to get the serious habitability issues before <u>some</u> court -- and had sent Defendant NCB a copy of his earlier letter dated July 31, 2001 to Defendant NCB (Exh. N and

21

also enclosure with Exh. W) because Defendant ROSICKI appeared not to have obtained and reviewed Plaintiff's prior correspondence sent directly to its client.

55.    Once again, Defendant ROSICKI provided no response to Plaintiff concerning this matter.    And, once again, payment was made by its client NCB without any notice to or contact with Plaintiff.    And, once again, Plaintiff learned of the fact of this second instance of improper payment -- that effectively deprived him of the rights guaranteed to him under Real Property Law Section 235-b -- after the fact.    Indeed, it was only sometime in January or February 2002 that Plaintiff learned of this second improper payment of purported "arrears" -- that, again, included a $500 legal fee for the services of Defendant GREENSTEIN STARR and Defendant ROSCHELLE for the preparation of a simple form notice -- when he happened to look at the Annual Borrower Statement that he had received from Defendant NCB in January or February 2002.    (This Annual Borrower Statement is annexed as Exhibit GG).

Plaintiff's Receipt in Mid-February 2002 of the Opinions
of Defendant NCB's *Own* Real Estate Experts Valuing the
Collateral *in Excess of Half a Million Dollars*

56.    After the belated receipt (noted above) on December 21, 2001, of the December 19, 2001 payoff letter setting forth the amount that Plaintiff would be entitled to pay to redeem his interest in the Collateral and avert foreclosure of that interest, Plaintiff wrote to Defendant Rosicki by letter dated January 13, 2002 requesting backup for the additional amounts set forth in that payoff letter as well as a copy of the brokers price opinions for which he was being billed.

22

(That January 13, 2002 [incorrectly dated 2001[8]] letter is attached as Exhibit HH).

57.     In response, Plaintiff received from Defendant Rosicki on or about February 15, 2002, two separate opinions commissioned by Defendant NCB that both evaluated the value of Plaintiff's Apartment -- and thus the Collateral that Defendants ROSICKI and Defendant NCB had been willing to sell two months' earlier (and remain willing to sell even at the present time) for the amount of its meager loan or even a portion thereof -- as in excess of half a million dollars.

Renewed Efforts by Defendants ROSICKI and NCB<br>To Sell Plaintiff's Apartment for a Fraction of Its Value

58.     By letter dated May 2, 2002 from Defendant ROSICKI, received by Plaintiff by certified mail on May 10, 2002, Defendant ROSICKI notified Plaintiff of the intention of Defendant ROSICKI and Defendant NCB to sell Plaintiff's Apartment at an auction sale on Thursday, May 23, 2002 (the "May 2, 2002 Notice of Sale"). (This May 2, 2002 Notice of Sale is annexed as Exhibit II).

59.     As reflected by the actual single-page Notice enclosed with the May 2, 2002, Defendant ROSICKI and Defendant NCB have used the same form as that which had been used in connection with the earlier November 29, 2001 Notice of Sale -- in spite of the numerous instances noted by Plaintiff in his previous correspondence as being in violation of law.

60.     Once again, by letters dated May 8, 2002 and May 14, 2002, Plaintiff has written

---

[8]     In a number of instances Plaintiff incorrectly dated 2002 dates as 2001 -- one of the hazards of the modern computer era that enables ready "cut and pasting" of the date and addressee portions of letter headings. From the context, however, it is clear that the correct date is in the year 2002.

to Defendant NCB protesting the schedule sale and the May 2, 2002 Notice of Sale as being in violation of applicable legal requirements -- including the FDCPA, the UCC's requirements of "good faith" and "commercial reasonableness" and New York law's implied covenant of good faith and fair dealing, etc. -- and has demanded that Defendant NCB advise Plaintiff, at the very least of the reserve (or equivalent term, e.g., minimum upset price) to insure that the sale will compensate Plaintiff for his substantial equity interest that is far in excess of the meager (by comparison) interest of NCB.  (Copies of these May 8 and May 14, 2002, letters are annexed as Exhibits JJ and KK, respectively).

61.    In response, Defendant ROSICKI, by letter dated May 14, 2002, has taken the unconscionable and commercially unreasonable position that Defendant ROSICKI and Defendant NCB will only guarantee an amount at sale that is less than or equal to the amount of its debt and charges related to enforcement -- approximately $93,000 -- for a cooperative apartment that NCB's own experts have opined to have a value substantially in excess of $500,000.  (This May 14, 2002 response from Defendant ROSICKI is annexed as Exhibit LL).[9]

62.    Indeed, press reports as recent as this past weekend, Saturday, May 18, and Sunday, May 19, 2002, reflect a current value for Plaintiff's Apartment that is well beyond the value estimated by Defendant NCB's own experts.  (These reports are annexed as Exhibit NN and OO, respectively).   Indeed, the May 198 New York Post article states that the "highest price per square foot - $856 -- remained in the Upper East Side's 10021 ZIP code".   Plaintiff's

_____

[9]    Plaintiff has received no further response from Defendant ROSICKI.   Indeed, Plaintiff has sent by fax to the principals of Defendant ROSICKI letters dated May 17 and May 21, 2002, concerning his complaint and his intention to apply for injunctive relief but has received no response to those letters.  (These May 17, 2002 and May 21, 2002 letters are annexed as Exhibits MM and PP).

Apartment is in that very same 10021 ZIP code and, by Defendant NCB's own original appraisal in 1994, contains 1010 square feet of living space, thus suggesting that the true market value of Plaintiff's Apartment is close to $1 Million!

Defendant NCB's Loan to the Cooperative Earlier This Year
Assuring NCB Income a Quarter Million Dollars for the Next 20 Years!!!

63.     Only last month Plaintiff learned of a possible reason why Defendant NCB has, for more than a year now, refused to take any action with respect to the severely-impaired Collateral despite numerous notices and repeated entreaties.

64.     Although the Cooperative failed to furnish to Plaintiff a copy of the 2001 Financial Statements that it provided to other tenant-shareholders, Plaintiff was able to look at a copy of the Financial Statements that were left at the concierge desk for distribution to other shareholders (whose name and apartment was inscribed on the first page) during a brief moment during which the doorman was distracted.   In the footnotes to the Financial Statements was that statement that earlier this year, on February 5, 2002, there had been a closing on a new 20-year loan to the Cooperative by NCB in the principal amount of approximately $4 Million and at an annual interest rate just under 7% to replace an existing mortgage from a different bank at a higher rate of interest, meaning that NCB should be assured of deriving approximately a quarter million dollars in interest income for the next 20 years -- or approximately $5 Million in interest income on its $4 Million loan to the Cooperative.  (A copy of the 2001 Financial Statement will added in the Amended Complaint that Plaintiff intends to file, as his right, within the period prior to the time that a responsive pleading is due, if Plaintiff is furnished a copy by the Cooperative

25

within that time.)

## FIRST CLAIM FOR RELIEF
(Use of an Unfair and Unconscionable Means to Attempt to Collect
and To Collect a Debt in Violation of the FDCPA – the May 17, 2001 Notice)

65.     Plaintiff repeats and realleges the allegations in Paragraphs 1 through 64 above as if fully set forth herein.

66.     The May 17, 2001 Notice constitutes an attempt to collect a "debt" within the meaning of the FDCPA.

67.     The May 17, 2001 Notice further constitutes a "communication" within the meaning of the FDCPA.

68.     The actions and omissions of the Defendants NCB, GREENSTEIN STARR and ROSCHELLE set forth above herein with respect to the May 17, 2001 Notice constitute the use of an unfair and unconscionable means to collect a debt in violation of the FDCPA.

69.     Plaintiff has sustained injury as a result of the aforesaid violation of the FDCPA by said Defendants.

70.     Plaintiff is therefore entitled to damages for injuries caused by such violation by said Defendants in amount to be determined at trial but in any event no less than $1 Million, together with punitive damages in the amount of $ 1 Million against each of said Defendants.

71.     Plaintiff is further entitled to a preliminary and permanent injunction prohibiting further use by said Defendants of any attempt to collect or to collect purported "arrears" in violation of law.

## SECOND CLAIM FOR RELIEF
(Use of an Unfair and Unconscionable Means to Attempt to Collect
and To Collect a Debt in Violation of the FDCPA -- the November 5, 2001 Notice)

72.     Plaintiff repeats and realleges the allegations in Paragraphs 1 through 64 above as if fully set forth herein.

73.     The November 5, 2001 Notice constitutes an attempt to collect a "debt" within the meaning of the FDCPA.

74.     The November 5, 2001 Notice further constitutes a "communication" within the meaning of the FDCPA.

75.     The actions and omissions of the Defendants ROSICKI, NCB, GREENSTEIN STARR and ROSCHELLE, set forth above herein with respect to the November 5, 2001 Notice constitute the use of an unfair and unconscionable means to collect a debt in violation of the FDCPA.

76.     Plaintiff has sustained injury as a result of the aforesaid violation of the FDCPA by said Defendants.

77.     Plaintiff is therefore entitled to damages for injuries caused by such violation by said Defendants in amount to be determined at trial but in any event no less than $1 Million, together with punitive damages in the amount of $ 1 Million against each of said Defendants.

78.     Plaintiff is further entitled to a preliminary and permanent injunction prohibiting further use by said Defendants of any attempt to collect or to collect purported "arrears" in violation of law.

27

### THIRD CLAIM FOR RELIEF
(Use of an Unfair and Unconscionable Means to Attempt to Collect
a Debt in Violation of the FDCPA – the September 27, 2001 Notice of Sale)

79.     Plaintiff repeats and realleges the allegations in Paragraphs 1 through 64 above as if fully set forth herein.

80.     The September 27, 2001 Notice of Sale constitutes an attempt to collect a "debt" within the meaning of the FDCPA.

81.     The September 27, 2001 Notice of Sale further constitutes a "communication" within the meaning of the FDCPA.

82.     The actions and omissions of the Defendants ROSICKI and  NCB set forth above herein with respect to the September 27, 2001 Notice of Sale constitute the use of an unfair and unconscionable means to collect a debt in violation of the FDCPA.

83.     Plaintiff has sustained injury as a result of the aforesaid violation of the FDCPA by said Defendants.

84.     Plaintiff is therefore entitled to damages for injuries caused by such violation by said Defendants in amount to be determined at trial but in any event no less than $1 Million, together with punitive damages in the amount of $ 1 Million against each of said Defendants.

85.     Plaintiff is further entitled to a preliminary and permanent injunction prohibiting further use by said Defendants of any attempt to collect or to collect purported "arrears" in violation of law.

## FOURTH CLAIM FOR RELIEF
(Use of an Unfair and Unconscionable Means to Attempt to Collect
a Debt in Violation of the FDCPA -- the May 2, 2002 Notice of Sale)

86.     Plaintiff repeats and realleges the allegations in Paragraphs 1 through 64 above as if fully set forth herein.

87.     The May 2, 2002 Notice of Sale constitutes an attempt to collect a "debt" within the meaning of the FDCPA.

88.     The May 2, 2002 Notice of Sale further constitutes a "communication" within the meaning of the FDCPA.

89.     The actions and omissions of the Defendants ROSICKI and NCB set forth above herein with respect to the May 2, 2002 Notice of Sale constitute the use of an unfair and unconscionable means to collect a debt in violation of the FDCPA.

90.     Plaintiff has sustained injury as a result of the aforesaid violation of the FDCPA by said Defendants.

91.     Plaintiff is therefore entitled to damages for injuries caused by such violation by said Defendants in amount to be determined at trial but in any event no less than $1 Million, together with punitive damages in the amount of $ 1 Million against each of said Defendants.

92.     Plaintiff is further entitled to a preliminary and permanent injunction prohibiting further use by said Defendants of any attempt to collect or to collect purported "arrears" in violation of law.

WHEREFORE, plaintiff demands judgment be entered in its favor against defendant as follows:

(a)     On its first claim for relief, granting compensatory damages in an amount to be determined at trial, but in any event no less than $1 million, and punitive damages in the amount of $1 million each as against Defendants NCB, GREENSTEIN STARR and ROSCHELLE, together with preliminary and permanent injunctive relief prohibiting further use by said Defendants of any attempt to collect or to collect purported "arrears" in violation of law.

(b)     On its second claim for relief, granting compensatory damages in an amount to be determined at trial, but in any event no less than $1 million, and punitive damages in the amount of $1 million each as against Defendants ROSICKI, NCB, GREENSTEIN STARR and ROSCHELLE, together with preliminary and permanent injunctive relief prohibiting further use by said Defendants of any attempt to collect or to collect purported "arrears" in violation of law.

(c)     On its third claim for relief, granting compensatory damages in an amount to be determined at trial, but in any event no less than $1 million, and punitive damages in the amount of $1 million each as against Defendants ROSICKI and NCB, together with preliminary and permanent injunctive relief prohibiting further use by said Defendants of any attempt to collect or to collect amounts owed or claimed to be owed to Defendant NCB in violation of law.

(d)     On its fourth claim for relief, granting compensatory damages in an amount to be determined at trial, but in any even not less than $1 million, and punitive damages in the amount of $1 million each as against Defendants ROSICKI and NCB, together with preliminary and permanent injunctive relief prohibiting further use by said Defendants of any attempt to collect or to collect amounts owed or claimed to be owed to Defendant NCB in violation of law.

(e)     On all claims for relief, Plaintiff's costs and expenses, including the reasonable value of his legal services, as provided under the Fair Debt Collection Practices Act, together with such other and further relief as to this Court shall seem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury of the issues in this action.

Dated:  Brooklyn, New York
        May 22, 2002

THOMAS P. MILTON, ESQ. (TM-6300)
305 East 72 Street, 1A-North
New York, New York 10021
Phone:  (212) 734-4409

Plaintiff Pro Se

31